UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

WILLIAM MESSER,

     Plaintiff,

        v.

SCARBOROUGH PUBLIC SCHOOLS,

     Defendant.

Civil Action No.

<u>COMPLAINT</u>
<u>INJUNCTIVE RELIEF REQUESTED</u>

NOW COMES the Plaintiff, William Messer ("Messer" or "Plaintiff"), by and through undersigned counsel, and complains against the Defendant, Scarborough Public Schools ("Scarborough" or "Defendant") as follows:

<u>JURISDICTION AND PARTIES</u>

1.     This action arises under Title IX of the Civil Rights Act of 1964 ("Title IX"), 20 U.S.C. § 1681; the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551 *et seq.*; the Maine Whistleblowers' Protection Act ("MWPA"), 26 M.R.S. § 831 *et seq.*; and the First Amendment to the U.S. Constitution as enforced through 42 U.S.C. § 1983 ("Sec. 1983").

2.     Plaintiff is a United States citizen residing in Gorham, Cumberland County, Maine.

3.     Defendant is the public-school department for the Town of Scarborough, Maine.

4.     Defendant employed fifteen (15) or more employees for each working day in each of twenty (20) or more calendar weeks in the same calendar year as when the alleged retaliation occurred.

1

5.      At all times material to this Complaint, Defendant employed more than 500 employees.

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

7.      On September 26, 2023, Plaintiff timely filed a Charge of Discrimination with the Maine Human Rights Commission ("MHRC") and the Equal Employment Opportunity Commission ("EEOC"), asserting claims of unlawful retaliation.

8.      The MHRC subsequently investigated the matter, which included review of written submissions, request and review of documentation and information from the parties, and Issues & Resolution Conference during which witnesses provided testimony.

9.      On September 4, 2025, the MHRC issued an Investigator's Report which substantiated Messer's allegations and concluded that there were reasonable grounds to believe that Scarborough Public Schools retaliated against Messer for engaging in protected activity.

10.     On October 27, 2025, the MHRC adopted the Investigator's Report and findings.

11.     On or about February 4, 2026, the MHRC issued a Notice that conciliation had failed.

12.     On or about February 9, 2026, the MHRC noted that the MHRC case was now closed, and that Plaintiff could pursue his case in litigation.

13.      Messer has exhausted his administrative remedies with respect to all claims set forth in this Complaint.

FACTUAL ALLEGATIONS

2

14.    Plaintiff began working for Defendant for the 2022–2023 school year as a counselor and social worker under a one-year contract.

15.    Plaintiff's one-year contract began on September 1, 2022, and was set to expire on August 31, 2023.

16.    Plaintiff's responsibilities included working directly with students and providing mental health counseling and social-work services, with a focus on substance-use and at-risk behaviors, both in the school and in the community.

17.    In randomized walkthrough observations as part of Plaintiff's overall evaluation, Plaintiff was consistently graded as Proficient or Distinguished and was commended for earning the trust and respect of the students he served, their families, and stakeholders, including the Maine Department of Health and Human Services ("DHHS").

18.    In her February 14, 2022, observation, Principal Sue Ketch ("Ketch") praised Plaintiff's work with a student, noting, "This was a really nice warm meeting with this student" and concluding "Nice work."

19.    Defendant never issued Plaintiff any disciplinary action during his employment.

20.    Defendant never informally counseled Plaintiff about his performance or conduct.

21.    Defendant never gave Plaintiff any reason to believe he performed poorly.

22.    In January 2023, at the request of a Guidance Counselor, Plaintiff attempted to get involved in a student conflict in the hopes that he could act as a mediator.

23.    Afterwards, Defendant directed Plaintiff to refer that type of student conflict to an Assistant Principal in the future.

24.    When he discussed this incident with Assistant Principal Nate Theriault ("Theriault"), Plaintiff was told that he did not do anything wrong in connection with the January 2023 matter.

25.    Theriault explained that, while in other public school settings it would have been appropriate for school-based social workers to lead and mediate peer conflicts, the Defendant preferred to involve administrators because affluent parents in the district could initiate legal action relating to student conflict.

26.    Plaintiff understood and complied with the request.

27.    Nothing like this ever occurred again during Plaintiff's tenure, and Plaintiff was never spoken to again about the matter.

28.    On April 28, 2023, Plaintiff had a conversation with Assistant Principal Jacob Brown ("Brown") regarding allegations of bullying and strife between two students.

29.    Brown asked Plaintiff to speak with Guidance Counselor Ryan Soucey ("Soucey") and Social Worker Christina Gerber ("Gerber") about a potentially related issue that occurred in the fall of 2022.

30.    On May 1, 2023, Plaintiff spoke with Soucey.

31.    Soucey informed Plaintiff that a student ("Student A") had arrived at Soucey's office, emotional and crying, after Student A's health class in November or December 2022.

32.    Soucey told Plaintiff that Student A disclosed that she was "raped" by another high school student ("Student B") and that the contents of her health class had triggered her.

33.     Soucey told Plaintiff that he believed Student A reported that the rape occurred at a movie theater, off district property, and outside of school hours.

34.     Plaintiff asked Soucey whether he had called Student A's parents or reported the disclosure to DHHS.

35.     Soucey told Plaintiff that he did not call Student A's parents or report to DHHS because Student A said, "You don't need to call my mom, I already told her."

36.     Plaintiff asked Soucey how he could confirm Student A's parents knew, and Soucey responded that he "wasn't sure."

37.     Soucey told Plaintiff that he'd referred Student A to Gerber because Student A was not ready to return to class in her emotional state.

38.     Soucey said that he'd referred Student A to Gerber because he believed Student A would feel more comfortable discussing sexual assault with a female social worker.

39.     When Plaintiff asked, Soucey said that he "wasn't sure" whether Gerber had called Student A's parents or reported the assault to DHHS.

40.     Soucey did say that he had reported the disclosure to Brown and Theriault immediately after it occurred.

41.     On May 2, 2023, Plaintiff met with Gerber to follow up regarding the incident with Student A.

42.     Gerber confirmed that Student A came to her office after meeting with Mr. Soucey.

43.     Gerber reported that Student A disclosed a sexual assault at a movie theater by Student B.

44.     Gerber reported that Student A "might have said rape."

5

45.     Gerber told Plaintiff that she observed Student A crying and allowed Student A to remain in her office for support.

46.     Gerber said that she'd scheduled a follow-up meeting with Student A.

47.     Gerber said that Student A did not return for the scheduled follow-up meeting.

48.     Gerber said that Student A did not return for follow-up support at any point afterward.

49.     Gerber acknowledged to Plaintiff that she "should probably reach back out and see what [Student A] needs."

50.     Plaintiff asked Gerber whether Student A's parents had been informed and whether anyone reported the matter to DHHS or law enforcement.

51.     Gerber reported that Student A told her she did not need to call her mother because her mother already knew.

52.     Gerber said that she did not call Student A's parents, DHHS, or law enforcement.

53.     Gerber said that she reported the disclosure to Brown.

54.     During these conversations, on May 1st and May 2nd, respectively, Plaintiff told both Soucey and Gerber that he believed they were legally required to report the disclosure to DHHS and notify Student A's parents.

55.     Plaintiff told both Soucey and Gerber that he would follow up with Brown.

56.     Later, on May 2, 2023, Plaintiff spoke with Brown again about Student A's report.

57.     Plaintiff informed Brown of what Plaintiff learned from Gerber and Soucey.

58.     Plaintiff expressed concerns that the school did not provide clinical follow-up support for Student A.

6

59.     Plaintiff stated that it was his understanding that the Defendant had legal obligations to investigate and address a hostile educational environment affecting Student A.

60.     Plaintiff stated that he believed Student A's continued attendance at school with Student B could create an atmosphere of ongoing harassment.

61.     Plaintiff stated that he believed Student B's continued presence could interfere with Student A's ability to learn and participate.

62.     Plaintiff understood that the report of bullying and strife, from April 28, 2023, involved Student B and a sibling of Student A.

63.     Plaintiff believed that this report suggested that the sexual assault from the fall of 2022 could have a continuing adverse impact on both Student A and Student B's education.

64.     Plaintiff asked Brown whether Brown reported the matter to Student A's parents, DHHS, or law enforcement.

65.     Brown told Plaintiff that someone made a report to "South Portland Police", and directed Plaintiff to focus on supporting Student B, which was the student who was actually a part of Plaintiff's caseload.

66.     Plaintiff told Brown that contacting law enforcement about a possible crime was good but insisted that the school also needed to report to DHHS and to Student A's parents.

67.     Plaintiff reminded Brown that they served as mandated reporters.

68.     Plaintiff told Brown that they could not rely on Student A's statements as confirmation that Student A's mother knew, as most rape victims avoid telling their parents.

69.     Plaintiff insisted that Defendant make proper reports and take proper follow-up clinical support, particularly where the Plaintiff had concerns that the correct police department was not contacted, considering incident occurred at a movie theater in Saco, Maine.

70.     Plaintiff raised concerns that the situation could create a hostile educational environment for Student A and Student B.

71.     Brown ended the conversation abruptly by getting up from his desk and saying that he had another meeting to go to.

72.     Brown failed to discuss what the next steps should be to manage the issue and did not provide Plaintiff with any additional support, resources, or advice on how to proceed.

73.     Three days later, on May 5, 2023, Plaintiff was told by Principal Ketch that his contract would not be renewed for the following school year.

74.     Ketch told Plaintiff that the non-renewal decision was not based on Plaintiff's work performance or evaluations.

75.     Plaintiff asked Ms. Ketch several times why Defendant decided not to renew his contract.

76.     When Plaintiff asked Ketch what the reasons were for his non-renewal, she stated three different times that she "was advised not to say any more."

77. Plaintiff told Ketch that the non-renewal surprised him because Defendant had not warned him that his job was in jeopardy, had not criticized his performance, and because no concerns were raised in his last scheduled supervision with Ketch on March 22, 2023.

78. Ketch acknowledged that she expected Plaintiff would feel surprised.

79. Ketch offered to allow Plaintiff to leave work early.

80. Plaintiff declined to leave work early.

81. Plaintiff asked Ketch whether he could speak with Assistant Principals Brown and Theriault to obtain feedback about the non-renewal decision.

82. Plaintiff said that he wanted to get suggestions and feedback on how he could improve in the future, as his hope was to secure another social work job in an academic setting.

83. Ketch said that this would be fine.

84. On May 9, 2023, Plaintiff met with Theriault about the non-renewal.

85. Theriault told Plaintiff that he, Ketch, and Brown had recently met to discuss probationary staff members.

86. Theriault told Plaintiff that he had not heard specific concerns about Plaintiff's performance.

87. Theriault told Plaintiff that he had learned about "something that had happened recently."

88. Plaintiff asked Theriault whether the "something" referred to the situation with Student A and Student B.

89. Theriault responded that it "might have been something that came up."

90.    Plaintiff told Theriault that he may not have received an accurate account of the situation.

91.    Plaintiff described to Theriault exactly what had occurred and reiterated his concerns about reporting obligations and protecting Student A from a hostile educational environment.

92.    Theriault told Plaintiff that it sounded like Theriault "needed to do some more digging."

93.    Theriault recommended that Plaintiff submit a letter of resignation because it would look better when Plaintiff applied for another school-based position.

94.    Theriault told Plaintiff that Plaintiff was likely "overqualified" for the position.

95.    Theriault praised Plaintiff's skill set and offered to serve as an employment reference.

96.    Based on all of Plaintiff's conversations with decision makers surrounding his non-renewal, it seemed clear to him that there was no substantive reason that his contract had not been renewed, especially considering Plaintiff's positive evaluations.

97.    After Plaintiff retained legal counsel and requested reasons for the non-renewal decision, Defendant provided several reasons that had previously never been mentioned to the Plaintiff or marked in his prior evaluations or supervisions.

98.    Defendant identified "procedure and confidentiality" and asserted that Plaintiff overstepped the bounds of his role.

99.    Defendant also identified "professionalism" and asserted that Plaintiff made joking references to drugs and used unkind or sarcastic language.

100. This was the first Plaintiff had ever heard of these critiques, as he had never been disciplined for either of these issues prior to his non-renewal.

101. The reasons that Defendant gave contradicted all of the information that Plaintiff had previously received about the reasons for his non-renewal.

102. The reasons provided by Defendant also contradicted the information that administrators gave when explaining the non-renewal to the Maine Education Association.

103. There is nothing in Plaintiff's personnel file that indicates he engaged in any substantive wrongdoing.

104. The only evidence that any concerns existed was a March 16, 2023, email sent from Gerber to Ketch that was admittedly written "in frustration".

105. Plaintiff denies the allegations in this email and contends that several credible witnesses can confirm that he never engaged in these behaviors, including fellow social workers Jackie D'Annibale ("D'Annibale") and Elise Lehotsky ("Lehotsky").

106. Plaintiff was never made aware of Gerber's email or any of the allegations contained within it until after he was not renewed and had retained legal counsel.

107. Defendant did not investigate or substantiate the allegations reflected in the March 16, 2023 email before deciding not to renew Plaintiff's contract.

108. Defendant did not identify evidence showing that the March 16, 2023, email influenced the non-renewal decision.

109. The prospect that the Defendant would terminate an employee because another employee sends an unverified, frustrated email, without any investigation, is implausible.

110.    After this incident occurred, Defendant still assigned Plaintiff to manage a sensitive incident involving staff, parents, and DHHS on or around April 28, 2023.

111.    Plaintiff was given the assignment without support or guidance from the administration.

112.    This conflicts with Defendant's allegations about their concerns with Plaintiff's professionalism and confidentiality.

113.    Plaintiff was also accused of making inappropriate comments about marijuana "gummies" in front of students.

114.    Plaintiff does not recall making the specific "gummies" remarks attributed to him.

115.    Plaintiff can recall a conversation with a secretary about anxiety relating to an upcoming wedding in spring 2023.

116.    Plaintiff did not recommend or encourage the secretary to use "gummies."

117.    Plaintiff recalled that the conversation occurred in the Student Services Center outside of school hours when no students were present.

118.    Plaintiff would never make light of recreational drug use in the presence of students.

119.    Plaintiff specializes in substance abuse counseling and was responsible for coordinating the first Alateen program in the High School.

120.    Plaintiff objected to Defendant's handling of Student A's report of rape/sexual assault by Student B.

121.    Plaintiff raised concerns that Defendant failed to provide appropriate services and clinical support to Student A after Student A's disclosure.

122. Plaintiff raised concerns that Defendant failed to notify Student A's parents and failed to report to DHHS.

123. Plaintiff held a reasonable, good-faith belief that the failures to notify parents and/or report to DHHS violated legal obligations.

124. Plaintiff held a reasonable, good-faith belief that Defendant's failure to check in with Student A and failure to take steps to ensure that Student A's interactions with Student B did not impair her access to education violated legal obligations.

125. Students have a right to attend school without being subjected to a hostile educational environment under the MHRA and Title IX.  This is particularly true when the hostile educational environment relates to matters of sexual assault by a fellow student.

126. Plaintiff's reports to his employer implicated these rights.

127. Plaintiff raised his concerns to shed light on an illegal practice.

128. His hope in raising his concerns was that the Defendant would address and eliminate what he perceived to be violations of the law.

129. Plaintiff engaged in protected activity when he objected to what he reasonably believed were failures to make mandated reports.

130. Plaintiff engaged in protected activity when he objected to what he reasonably believed were failures to address and remedy a hostile educational environment arising from Student A's report.

131. Plaintiff's objections and statements regarding the handling of Student A's report of sexual assault were reports on a matter of public concern and importance and were protected speech for purposes of 42 U.S.C. § 1983.

13

132. Plaintiff was unlawfully retaliated against when his contract was not renewed in response to his protected reports.

133. In the course of the MHRC's investigation, an Issues and Resolutions Conference was held on October 15, 2024.

134. Witnesses testified at that conference, including Soucey, Gerber, Brown, Theriault, and Superintendent Diane Nadeau ("Nadeau").

135. Defendant's witnesses gave contradictory testimony.

136. Nadeau testified that the Defendant has emails that show that their decision not to renew Plaintiff's contract predated his reports regarding the mishandling of Student A's rape allegation.

137. To date, Defendant has failed to produce any emails or evidence corroborating this claim.

138. Nadeau's testimony conflicts with the testimony of Brown, who clearly indicated that the meeting that was held to discuss the renewal of Plaintiff's contract did not occur until May 5, 2023.

139. Later, Soucey testified that he brought Student A's assault to the attention of Brown and Theriault in March of 2023.

140. Theriault agreed with this assessment but testified that it was his understanding that Brown was responsible for investigating the complaint, which is confusing considering that he'd previously directed Plaintiff to speak to Soucey and Gerber.

141. Brown then contradicted both Soucey and Theriault by stating that he was not made aware of the situation until April 28, 2023, when Messer brought it to his attention.

142.    Soucey also testified that when he referred Student A to Gerber, he did so only after explaining to Gerber that he believed Student A would feel more comfortable talking to a female counselor about her sexual assault.

143.    Gerber testified that neither Soucey nor Student A made any indication about why Student A was so upset and said that there was supposedly no discussion regarding the reason why Student A had been referred to Gerber in the first place.

144.    Altogether, Defendant's witnesses provided conflicting accounts regarding when the student's disclosure was reported, to whom it was reported, and who held responsibility for follow-up or investigation.

145.    The contradictory testimony supports that Plaintiff was justified in his concerns that Student A's disclosure had not been properly investigated or reported.

146.    Despite this, both Brown and Theriault acknowledged that Defendant based the non-renewal decision on Plaintiff's alleged "failure to stay in his lane," and "stepping out of the responsibilities of his role".

147.    Theriault acknowledged that one of the ways Plaintiff failed to "stay in his lane" was by inserting himself into the handling of Student A's report of sexual assault.

148.    Theriault also testified that when he and the other decision makers were deciding whether to renew Plaintiff's contract, they explicitly discussed Plaintiff's reports/objections regarding Student A's disclosure of sexual assault as a negative factor.

149.    Defendant refused to renew Plaintiff's contract and took adverse action against Plaintiff after Plaintiff raised concerns about mandated reporting and student-safety obligations.

150. Theriault's admission that Plaintiff's reports and objections to the handling of Student A's disclosure of sexual assault were a factor in the decision not to renew his contract is direct evidence of causation and unlawful retaliation.

151. The probative timing of the events in this matter supports a causal connection between Plaintiff's protected activity and Defendant's non-renewal decision, including evidence of motive, animus, and pretext.

152. Defendant's shifting, inconsistent, untrue explanations for Plaintiff's termination constitute evidence of pretext and evidence a causal connection between Plaintiff's protected activity and his termination.

153. Defendant's refusal to renew Plaintiff's contract caused Plaintiff to suffer damages, including lost wages, lost benefits, out-of-pocket costs, and loss of enjoyment of life.

154. Defendant violated Plaintiff's rights with knowing and reckless disregard for these rights.

COUNT I: MHRA – RETALIATION

155. Plaintiff reasserts and incorporates by reference Paragraphs 1 through 154 as if fully set forth herein.

156. Plaintiff engaged in protected activity by opposing a hostile educational environment, and reporting and opposing conduct Plaintiff reasonably believed to be unlawful and/or in violation of the MHRA.

157. Defendant retaliated against Plaintiff by refusing to renew Plaintiff's contract.

158.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered lost wages, benefits, loss of enjoyment of life, humiliation, and other economic and non-economic damages.

## COUNT II: MWPA – RETALIATION

159.    Plaintiff reasserts and incorporates by reference Paragraphs 1 through 158 as if fully set forth herein.

160.    Plaintiff engaged in protected activity under the MWPA, as enforced through the MHRA, by reporting and opposing, in good faith, what he reasonably believed were violations of the law, including a failure to make mandated reports.

161.    Defendant retaliated against Plaintiff by refusing to renew Plaintiff's contract.

162.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered lost wages, benefits, loss of enjoyment of life, humiliation, and other economic and non-economic damages.

## COUNT III: TITLE IX – RETALIATION

163.    Plaintiff reasserts and incorporates by reference Paragraphs 1 through 162 as if fully set forth herein.

164.    Plaintiff engaged in activity protected by Title IX, including reporting and opposing sexual harassment in context of the school where he was employed and conduct Plaintiff reasonably believed to be unlawful and/or in violation of Title IX.

165.    Defendant retaliated against Plaintiff by refusing to renew Plaintiff's contract.

166.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered lost wages, benefits, loss of enjoyment of life, humiliation, and other economic and non-economic damages.

COUNT IV – 42 U.S.C. § 1983 Violation

167.    Paragraphs 1 – 166 are incorporated by reference.

168.    The First Amendment to the United States Constitution gives persons a right to freedom of speech and to petition the Government for redress of grievances.

169.    The First Amendment prohibits retaliation by a government for an individual exercising protected expressions of speech, association, and the right to petition.

170.    Government employees have a limited right to engage in free speech of matters of public concern or importance, and government employers are prohibited from retaliating against their employees for exercising this right.

171.    All of Plaintiff's reports, as set out above, were matters of public concern.

172.    The rights granted by the United States Constitution are enforced through Section 1983, which states, in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…" 42 U.S.C. § 1983.

173.    Ketch, Theriault, and Brown, who had final policymaking authority, decided to terminate Plaintiff's employment and followed through on this decision.

174.    Defendant, acting under the color of law, violated Plaintiff's First Amendment right to free speech and the right to petition the government when it terminated Plaintiff.

18

175.    By terminating Plaintiff for engaging in constitutionally-protected speech and engaging in petitioning activity, Defendant has violated Plaintiff's right under the First Amendment to the United States Constitution as enforced through 42 U.S.C. § 1983.

176.    Where Ketch, Theriault, and Brown engaged in the retaliation and were also the Defendant's Principal and Vice Principals, the Defendant had actual knowledge of the retaliation.

177.    Plaintiff seeks injunctive relief and all compensatory, punitive, and economic damages available under the law, including attorneys' fees and costs, in an amount to be determined at trial.

### PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

A.    Declare the conduct engaged in by Defendant to be in violation of Plaintiff's rights;

B.    Enjoin Defendant, its agents, successors, employees, and those acting in concert with it from continuing to violate Plaintiff's rights;

C.    Order Defendant to reinstate Plaintiff or award front pay to Plaintiff;

D.    Award lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendant's unlawful conduct;

E.    Award equitable relief for back pay, benefits and prejudgment interest;

F.    Award compensatory damages in an amount to be determined at trial;

G.    Award punitive damages in an amount to be determined at trial;

H.    Award nominal damages;

I.    Award attorneys' fees, including legal expenses, and costs;

19

J.    Award prejudgment interest;

K.    Permanently enjoin Defendant from engaging in any employment practices which violate the laws it violated in this case;

L.    Require Defendant to mail a letter to all employees notifying them of the verdict against them and stating that Defendant will not tolerate discrimination or retaliation in the future;

M.    Require that Defendant post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

N.    Require that Defendant train all management level employees on the protections afforded by the MHRA, MWPA, and Title IX;

O.    Require that Defendant place a document in Plaintiff's personnel file which explains that Defendant unlawfully refused to renew/terminated Plaintiff because of unlawful retaliation; and

P.    Grant to Plaintiff such other and further relief as may be just and proper.


Dated: March 24, 2026                              /s/ Chad T. Hansen

                                                   Chad T. Hansen
                                                   Attorney for the Plaintiff

                                                   EMPLOYEE RIGHTS GROUP
                                                   92 Exchange Street 2nd floor
                                                   Portland, Maine 04101
                                                   Tel. (207) 874-0905
                                                   Chad@EmployeeRightsLaw.Attorney